## Commonwealth v. Grimm.

*Homicide — Murder — Voluntary manslaughter—"Unwritten law"—Self-defence—Intervening cause of death—Pneumonia—Presumption of innocence —Reasonable doubt—Good character—Preponderance of evidence.*

1. Murder is committed when a person of sound memory and discretion unlawfully kills any reasonable creature in being, under the peace of the Commonwealth, with malice aforethought, express or implied. Malice in this connection is not to be understood merely as a particular ill-will, a spite or a grudge. Malice is a legal term implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty, although a particular person may not be intended to be injured.

2. All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate, any arson, rape, robbery, burglary or kidnapping, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder in the second degree. A specific and malicious intention to kill is the essence of wilful, deliberate and premeditated killing. The law fixes upon no length of time as necessary in which to form the intention to kill, but leaves the existence of a fully-formed intent as a fact to be determined by the jury from all the other facts and circumstances in the evidence.

3. All homicide is presumed to be malicious, but the presumption rises no higher than murder of the second degree. The burden is on the Commonwealth to show such facts as will justify the jury in returning a verdict of murder of the first degree. The degree of crime as between murder of the first degree and murder of the second degree is always a matter for the determination of the jury.

4. Voluntary manslaughter is where injuries are inflicted unlawfully and sometimes intentionally, under the influence of passion, but without legal malice, and death ensues. Passion in this sense means any of the emotions of the mind known as anger, rage, sudden resentment or terror rendering the mind incapable of cool reflection. An uncontrollable fear impelling the commission of a homicide will reduce the crime to the grade of voluntary manslaughter. But to reduce the crime, the circumstances must show an absence of cool depravity of heart or wanton cruelty. If reason has its sway, the killing will be murder.

5. In every criminal case, the person accused of crime is presumed to be innocent until his guilt is clearly established; and it is incumbent on the Commonwealth to prove, to the satisfaction of the jury beyond a reasonable doubt, the presence of every ingredient necessary to constitute the crime charged in the indictment. That burden never shifts, but rests on the prosecution throughout; so that in any case a conviction can be had only after the jury have been convinced beyond a reasonable doubt of the defendant's guilt. It is the duty of the jury to give the prisoner the benefit of any reasonable doubt arising out of the evidence which prevents them from coming to a satisfactory conclusion. But it must be an honest doubt, such a difficulty as fairly strikes a conscientious mind and clouds the judgment. If the mind be fairly satisfied of a fact on the evidence, as much so as would induce a man of reasonable firmness and judgment to take the fact as true, and to act upon it in a matter of importance to himself, it is sufficient upon which to rest a verdict.

6. Evidence of good character is substantive and positive proof in the prisoner's behalf, and may of itself give rise to a reasonable doubt as to his guilt which otherwise would not exist, by making it improbable that a person of such character would commit the offence charged in the indictment. Such evidence is not a mere makeweight thrown in to assist in the production of a result that would happen at all events, but is to be regarded as evidence of a substantive fact, like any other evidence tending to prove innocence, and is to be weighed and considered by the jury in connection with all the other evidence in the case.

7. There is no such thing in the jurisprudence of Pennsylvania as that which sometimes is called or designated the "unwritten law." The fact that one man sexually corrupts the wife of another will not legally justify the wronged husband in killing his wife's paramour. But while that is true, nevertheless, it is competent to put in evidence the facts surrounding the case, so that the jury may be better able to judge of and determine the conditions of mind and the intents, motives and responsibilities of a slayer at the time of committing the homicide,

Commonwealth v. Grimm.

and the plans, thoughts and purposes of the deceased immediately prior to meeting the assault. In order that the determination of the case by the jury may be unerring and their judgment sound, they are entitled to all the relative facts from every viewpoint and angle.

8. Every person is to be held to contemplate and to be responsible for the natural consequence of his own acts. If a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of that felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes co-operated in producing the fatal result. It may be said that neglect of a wound or its unskillful and improper treatment must in law be deemed to have been among those things which were in contemplation of a prisoner, and for which he is to be held responsible. It is not requisite that the wounds be the immediate cause of death to render a defendant responsible for their consequences. It is sufficient if they be the mediate cause. Even when a wound is not mortal in itself, but from want of proper applications, or attention, or from neglect, develops into pneumonia, and that pneumonia is the immediate cause of the death of the person wounded, the person by whom the wound was given is guilty of murder or manslaughter, according to the circumstances of the case. For though the pneumonia, and not the wound, be the immediate cause of the death, yet the wound being the cause of the pneumonia, is the mediate cause of the death. It is only where the death is attributable solely to the secondary agency, such as pneumonia, and is not at all induced by the primary one, the wound, that the intervention of the pneumonia constitutes a defence. If the pneumonia was the sole and absolutely independent cause of the death, the defendant is not to be held responsible; but if the wound superinduced the pneumonia which finally caused the death, the defendant is guilty of the homicide if he inflicted the wound.

9. Life may be taken lawfully in self-defence, but usually it must appear that he who takes it reasonably believed on the facts as they appeared to him at that time that he was in imminent danger of death or great bodily harm, and that no other way of escape from the danger was open to him. Ordinarily, it is the duty of one assailed to flee if flight appears possible, and it is only when he is persuaded that he must suffer death or grievous bodily harm at the hands of his assailant, or take the life of his assailant in order to save himself, that he can justify his act as done in self-defence. But a man is not required to flee from his own home. He has a right to resist an assailant's attack there by any means apparently made necessary by the exigency of the occasion, if the circumstances are such as to create a just and reasonable apprehension of danger in the mind of a reasonable man, and did create such an apprehension in the mind of the defendant.

10. When self-defence is alleged as a justification or excuse for a killing, the defendant must prove to the satisfaction of the jury, by a fair preponderance of the evidence, or it must appear to the jury from a fair preponderance of all the evidence in the case, that the killing was done in self-defence. To preponderate means to exceed in weight and influence. A preponderance of the evidence is where the proof on one side of a particular question overbalances the proof on the other side of the same question. It does not mean, necessarily, the testimony of a larger number of witnesses, but it means the evidence in which the jury have the more confidence and upon which they prefer to rest their judgment.

Charge to the jury. O. & T. Fayette Co., March T., 1924, No. 16.

Dean D. Sturgis, Second Assistant District Attorney, and S. John Morrow, for Commonwealth.

H. S. Dumbauld, for defendant.

VAN SWEARINGEN, P. J., March 10, 1924.—Members of the jury: You are trying the defendant on an indictment containing two counts. In one of these counts the defendant is charged with murder, and in the other he is charged with assault and battery with intent to kill and murder. If, under the evidence and the law as we shall state it to you hereafter, you find the defendant guilty of murder in either of its degrees or of voluntary manslaughter, then you need not give further consideration to the count of assault and battery with intent to kill and murder, because it will have been included in

Commonwealth *v.* Grimm.

your verdict already reached. But if you do not find the defendant guilty of murder in either of its degrees, nor of voluntary manslaughter, then you will give consideration to the count of assault and battery with intent to kill and murder under the law as we shall state it to you later.

The defendant, Fred Grimm, and the deceased, Ralph Goldsboro, lived near each other in what is known as Kyle Row, in the Borough of Fairchance, six or seven miles from Uniontown. Goldsboro and his wife did not live together very continuously, and Grimm suspicioned Goldsboro of being too intimate with Grimm's wife. Discussions were had between the men, and the trouble finally was ended on the morning of Dec. 26, 1923, about eight o'clock, when Grimm shot Goldsboro several times with a Winchester repeating shot-gun; during the period of which shooting Goldsboro fired at Grimm twice with a revolver. Goldsboro had decided to leave on a trip to Florida on the day on which the shooting occurred, and in the morning of that day he left his own home, and upon reaching the street in front of his house, he turned toward the home of Grimm on an errand, as it is alleged by the Commonwealth, when Grimm, as contended by the Commonwealth, began firing at him from his yard and the road in front of his house with the shot-gun, and Goldsboro, after firing at Grimm twice with a revolver, retreated in the opposite direction, collapsing near the residence of Mrs. Ethel Gaskill, into whose home he was admitted. Mrs. Gaskill has testified that she heard the shooting, and that as she let Goldsboro into her house, Goldsboro with an oath, referring to Grimm, said: "I went out my gate and turned to go to the little store and saw Grimm in his yard with his gun raised toward me, and I turned in the other direction and he opened fire on me." There is evidence in the case that Goldsboro said he had heard that the defendant had made threats against him and that he had carried the revolver with which to protect himself.

Dr. R. E. Heath, who lives in Fairchance, was called and reached the injured man soon after the shooting. Dr. Heath has testified, and he is corroborated in this by other physicians, that Goldsboro had a bullet wound through his right eyelid, grazing the eyeball and passing over the nose; another bullet wound in his right hand or fingers; two bullet wounds in his right leg below the knee; and a bullet wound in the right hip, the bullet having entered from the side. Dr. Heath has testified that he dressed the wounds of the injured man, not at that time considering the wounds serious, but that he came back about one o'clock in the afternoon when Goldsboro complained of pain about the abdomen, and that later in the afternoon he was back again when Goldsboro complained of the pain being worse and more acute. Dr. Heath has testified that he then took Goldsboro to the Uniontown Hospital, where he was operated on at once, and that when the abdomen was opened it was found that the intestines had been penetrated in five places and the mesentery in two places by the bullet which had entered through the hip. Dr. Heath has said he saw Goldsboro several times while in the hospital, but did not attend him professionally, and that Goldsboro died on Jan. 10, 1924, at the hospital.

Dr. Heath was asked his opinion as to what caused Goldsboro's death, to which, owing to the peculiar nature of the case, we sustained an objection. He then was asked if he knew what caused the death, and he said he did, and said that death was caused by the gun-shot wounds, lowered vitality of the patient, and subsequent pneumonia. He said that, in his opinion, the pneumonia was caused by the gun-shot wounds and injury to the intestines. He said death was due finally to pneumonia, although death was caused by the gun-shot wounds. He said many cases of pneumonia develop subsequent to

shock and operations, and that in this instance the pneumonia developed the day the patient died. He said, in his opinion, there was a causal connection between the wounds to the intestines and the pneumonia, and that without an operation the wounds in the abdomen would have been fatal. Dr. S. A. Baltz, the county coroner, testified that he attended the *post-mortem* examination of the body of the deceased, but that he did not know what caused the death. Dr. H. A. Heise, the pathologist at the Uniontown Hospital, testified that he conducted the *post-mortem* examination of the body of the deceased, although he had not seen the patient before death; that both lungs were extremely congested, and that, in his opinion, given without objection, the cause of death was a weakened condition due to the gun-shot wounds, resulting in pleurisy and pneumonia. He said the causal connection between the wounds to the intestines and the pneumonia was the weakened condition of the patient, although he could not trace it, but that lowered vitality, as well as severe cold, sometimes superinduces pneumonia. He said the pleural cavity contained a straw-colored fluid and pus, but refused to declare that the gun-shot wounds were the cause of the pneumonia.

There is the testimony of a number of the neighbors of these parties that Grimm fired a number of shots from his shot-gun in the direction of Goldsboro. Many of them have said that Grimm fired as many as five shots in that direction, and it was testified to by A. W. Bell, the county detective, that, after Grimm was in custody, he asked Grimm if the gun that was offered in evidence before you was the gun he shot Goldsboro with, to which the defendan replied, "That's the gun." There is the testimony of a number of the neighbors that, after the shooting, the defendant said with an oath that he had killed Goldsboro, and many of them testified that, prior to that time, they heard the defendant say he intended to kill Goldsboro. There is evidence that, prior to the shooting, the defendant said he had made his wife leave home because Goldsboro had been coming there, and that he had watched for Goldsboro, intending to kill him, and had not "got" him, but would "get" him yet.

The defendant took the witness-stand in his own behalf and testified that he had known the deceased for ten or twelve years, and that they had been good friends until Oct. 31, 1923, when the defendant discovered that Goldsboro was unlawfully intimate with the defendant's wife, and that thereupon the friendship between the two men ceased. The defendant testified that he had been told of this intimacy three or four days earlier than that by Goldsboro's wife and his daughter, Mrs. Ward Kelley, and that on the date mentioned he went to work early in the morning, before daylight, and soon came back to his home and hid in the cellarway, watching for Goldsboro, who soon came to the house, but that Goldsboro's attention was attracted to where the defendant was hiding by the actions of the defendant's dog, which was in the yard, and that Goldsboro came and looked down into the cellarway and saw the defendant and that the defendant saw him, and that Goldsboro ran and jumped over the back fence and got away. The defendant testified that he went into the house and accused his wife of receiving the attentions of Goldsboro, which she denied, after which the defendant testified he slapped his wife and told her to leave, that he did not want to live with a woman of that kind. The defendant's wife did leave, and the defendant testified that he did not see her again until the following Sunday evening, when he met her at the home of Urbin Guthrie, his brother-in-law, when the defendant and his wife came to an agreement that they would stay together and raise the children, of whom they had seven living, three dead, and are expecting another one to be born the latter part of this month, and that the wife then went home with her hus-

band, as housekeeper, soon after which the defendant went on a hunting trip to Maryland and was gone three days. The defendant testified that, before starting on his hunting trip, he talked to Goldsboro, who denied everything, and that he told Goldsboro that his wife had admitted everything and that he then knew the truth, and that he told Goldsboro that, if she was satisfied, he could have the defendant's wife, but that Goldsboro said he did not want her, and that the defendant then told Goldsboro to stay away from the defendant's home, but that, upon returning from his hunting trip, the defendant ascertained from his wife that Goldsboro had been there during the defendant's absence, without invitation or permission of Mrs. Grimm. The defendant testified that on Christmas evening his wife asked him not to go to work early the next morning, saying that Goldsboro had threatened her and that she was afraid he would come back. The defendant said he remained at home the next morning and sat down in the front room, and that while sitting there he saw Goldsboro come out of his own gate and come along the fence toward the defendant's home, and that Grimm went and got his gun and went out over his back steps and watched Goldsboro, and that when Goldsboro got to the corner of the street he turned toward the defendant's house, and that the defendant then stepped off of his back porch and told Goldsboro to stop, that he had come far enough, and that Goldsboro did stop and pulled a revolver from his pocket and leveled it at the defendant when eight or ten feet from the fence. The defendant said he then fired, following which Goldsboro fired, with but little time between the shots, and that the defendant fired again and Goldsboro fired again. The defendant testified that he kept walking toward his front gate as he fired, and finally stepped out his gate and to the corner of his yard, and that Goldsboro kept "backing up" towards the Teets's house until the defendant had fired five times and Goldsboro had fired twice. The defendant said Goldsboro kept the defendant covered with his revolver as Goldsboro backed away, and that when the defendant fired the last shot and started back to his home, Goldsboro was about at Gaskill's gate. The defendant said he went outside his gate into the road to be sure Goldsboro had gone, because he was afraid Goldsboro might get behind the fence and fire at the defendant as he turned to go back to his house. He said he could not tell whether or not any of his shots took effect. The defendant said he shot in the beginning to keep Goldsboro from shooting him. He said he thought Goldsboro was coming to his house and that he did not want him to get there.

The defendant denied saying, after the shooting, that he had killed Goldsboro, or would do so, stating that what he did say was that Goldsboro had done everything to the defendant's family but kill them, and he guessed he would have done that if he could, or words to that effect. The defendant denied saying previously that he had watched for Goldsboro, intending to kill him, but stating that he did say if he had caught Goldsboro in his house he would have shot him.

Urbin Guthrie, the defendant's brother-in-law, testified that Goldsboro came to his house on Oct. 31st, saying that the defendant had caught him that morning, and telling the witness, who knew of Goldsboro's conduct, as he has told you, that he would quit it, but didn't, later admitting to the witness that he had been back to the defendant's home, and that in the course of the conversation Goldsboro said he would commit murder over that woman, meaning the defendant's wife, and that he would go through hell for her. This witness testified that he had told Goldsboro previously that the defendant would catch him at his home, but that Goldsboro replied he would take care of himself.

Bertha Grimm, the defendant's wife, took the witness-stand in behalf of her husband, and said she had been having improper relations at intervals with Goldsboro from August, 1919, to Oct. 31, 1923, when her husband caught Goldsboro at the house, and told how these intimacies began, saying that she protested at times, but that Goldsboro insisted, saying that he could not help it, that he had loved her ever since he had known her. She said that, after her husband had caught Goldsboro at the house and after she and her husband had made up again, she told her husband about her relations with Goldsboro, and she corroborated her husband in most he said that she knew of, which occurred prior to the shooting. She said Goldsboro came to her house after she had returned to her husband, following their separation, and wanted her to go away with him, which she refused to do. She said she asked Goldsboro to stay away from her home, but that he did not do so, although she said nothing improper occurred between her and Goldsboro after her reconciliation with her husband. She said she told her husband about Goldsboro threatening her, in the manner she has told you, and that she asked her husband to stay at home the morning following Christmas because she was afraid Goldsboro would come back to her home if he was away. She testified that on the morning her husband caught Goldsboro at the house, Goldsboro had come to the front door and rapped before he saw her husband in the cellarway. In the course of her testimony, she said that at about the beginning of their unlawful intimacies Goldsboro told her that his wife did not care for him, and had not been a wife to him for several years. Mrs. Grimm has told you much more also which it will be for you to remember.

There is evidence in the case that at the time of the *post-mortem* examination of the body of Goldsboro his intestines apparently had healed, and that then there was no evidence of perforations of the bowels. There is evidence that when Goldsboro was admitted to the hospital he was placed on a bed in the surgical ward and remained there until Jan. 8th, when he was given a private room, remaining there until he died. There is evidence that the fifth and sixth days of January were very cold days, with the wind blowing toward that side of the hospital which Goldsboro occupied. There is evidence that the thermometer in the hospital showed a normal temperature, but that the surgical ward was very cold. There is evidence that Goldsboro was in awful misery and that turpentine poultices were used on him. There is evidence that the pneumonia developed on Jan. 10th, the day Goldsboro died, although some say the day before that.

In rebuttal, Mrs. Ward Kelley denied that she ever told the defendant of improper relations existing between her father and Mrs. Grimm, and denied that she knew of such facts existing at the time fixed by the defendant as the date when he testified she and her mother had told him. Mrs. Kelley testified that she was not at home at that time, but was out of the State on an automobile trip. In this she is corroborated by other witnesses, who have said on the witness-stand they were on the automobile trip with her. Mrs. Kelley has testified that her mother never told the defendant the things he has said were told him in this connection, either in her presence or that she knows of. Mrs. Goldsboro was not present in court when this testimony was given, the allegation being that she was sick in bed.

What we have said covers the main features of the testimony in this case. But there is much other evidence in detail that you should remember and take into consideration when you make up your verdict.

Murder is committed when a person of sound memory and discretion unlawfully kills any reasonable creature in being, under the peace of the Common-

wealth, with malice aforethought, express or implied. Malice, in this connection, is not to be understood merely as a particular ill-will, a spite or a grudge. Malice is a legal term implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

It is provided by the law of this State that all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate, any arson, rape, robbery, burglary or kidnapping, shall be deemed murder in the first degree, and that all other kinds of murder shall be deemed murder in the second degree. A specific and malicious intention to kill is the essence of wilful, deliberate and premeditated killing. If a malicious intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary in which to form the intention to kill, but leaves the existence of a fully-formed intent as a fact to be determined by the jury from all the other facts and circumstances in the evidence.

All murder not of the first degree necessarily is of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty, but where no intent to kill exists or can reasonably be inferred. Therefore, in all cases of murder, if no intention to kill can be inferred or collected from the circumstances, the verdict should be murder of the second degree.

All homicide is presumed to be malicious, but the presumption rises no higher than murder of the second degree. The burden is on the Commonwealth to show such facts as will justify the jury in returning a verdict of murder of the first degree.

Voluntary manslaughter is where injuries are inflicted unlawfully and sometimes intentionally, under the influence of passion, but without legal malice, and death ensues. The passion may be that either of anger or terror, provided it reach a degree of intensity sufficient to obscure temporarily the reason of the person affected. Passion, in this sense, means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection. Although anger is the passion usually existing in such cases, yet any other passion, as sudden resentment or terror, rendering the mind incapable of cool reflection, may reduce the grade of the crime. Terror from the belief on the part of a slayer that his life is in danger is sufficient to reduce homicide to manslaughter, even though the belief is not reasonable. An uncontrollable fear impelling the commission of a homicide will reduce the crime to the grade of voluntary manslaughter. But to reduce the crime, the circumstances must show an absence of cool depravity of heart or wanton cruelty. If reason has its sway, the killing will be murder.

In every criminal case the person accused of crime is presumed to be innocent until his guilt is clearly established; and it is incumbent on the Commonwealth to prove to the satisfaction of the jury, beyond a reasonable doubt, the presence of every ingredient necessary to constitute the crime charged in

the indictment. That burden never shifts, but rests on the prosecution throughout; so that in any case a conviction can be had only after the jury have been convinced, beyond a reasonable doubt, of the defendant's guilt. In deciding upon the case, or upon any material part of it, it is the duty of the jury to give the prisoner the benefit of any reasonable doubt arising out of the evidence which prevents them from coming to a satisfactory conclusion. But such doubt must arise fairly out of the evidence and not merely be fancied or conjured up. You must not raise a mere fanciful or ingenious doubt to escape the consequences of an unpleasant verdict. It must be an honest doubt, such a difficulty as fairly strikes a conscientious mind and clouds the judgment. If the mind be fairly satisfied of a fact on the evidence, as much so as would induce a man of reasonable firmness and judgment to take the fact as true, and to act upon it in a matter of importance to himself, it is sufficient upon which to rest a verdict.

Eleven witnesses were called who have testified that the reputation of the defendant for peace and good order prior to this trouble was good. Evidence of good character is substantive and positive proof in the prisoner's behalf, and may of itself give rise to a reasonable doubt as to his guilt which otherwise would not exist, by making it improbable that a person of such character would commit the offence charged in the indictment. Such evidence is not a mere makeweight thrown in to assist in the production of a result that would happen at all events, but is to be regarded as evidence of a substantive fact, like any other evidence, tending to prove innocence, and is to be weighed and considered by the jury in connection with all the other evidence in the case.

It is our duty to say to you, and we do say to you, that there is no such thing in the jurisprudence of Pennsylvania as that which sometimes is called or designated the "unwritten law." The fact that one man sexually corrupts the wife of another will not legally justify the wronged husband in killing his wife's paramour. But while that is true, nevertheless, it is competent to put in evidence the facts surrounding the case, so that the jury may be better able to judge of and determine the conditions of mind and the intents, motives and responsibilities of a slayer at the time of committing the homicide, and the plans, thoughts and purposes of the deceased immediately prior to meeting the assault. In order that your determination of the case may be unerring and your judgment sound, you are entitled to all the relative facts from every viewpoint and angle.

It is contended here on behalf of the defendant that the deceased died of pneumonia and not of the bullet wounds, and, therefore, that the defendant is not to be held responsible for the death of the deceased. Every person is to be held to contemplate and to be responsible for the natural consequences of his own acts. If a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of that felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes co-operated in producing the fatal result. It may be said that neglect of a wound or its unskillful and improper treatment must in law be deemed to have been among those things which were in contemplation of a prisoner and for which he is to be held responsible. The true reason for not allowing such a defence is that a wound inflicted, though it may not have been the only cause, yet contributed mediately or immediately to the death of the person assaulted. To warrant escape from the responsibility for a killing, a subsequent development, mismanagement or neglect must have been the sole cause of death. No principle is better settled than that he who, by his wrongful act, accelerates or hastens death, or contributes to its

cause, is guilty of homicide, and whether this be murder or manslaughter necessarily depends on the intent or motive by which the person perpetrating it was actuated. If the injuries inflicted by a defendant directly contribute to produce empyema, causing death, he is guilty of taking the life of the deceased. A prisoner cannot escape the consequences of his act by showing that death was the result of an operation which his felonious act required. It is not necessary, in order to convict a prisoner, that it be made to appear that his actual personal violence was the sole and immediate cause of the death of the deceased. If the deceased would not have died except for the prisoner's assault, then the prisoner's act was in law the cause of death. Whenever a blow is inflicted under circumstances such as to render the party inflicting it criminally responsible if death follows, he will be deemed guilty of the homicide, though the person assaulted would not have died from this assault alone had not other causes grown out of and operated with it. A person is criminally answerable for a homicide where he inflicts wounds on another which devolve into or initiate an affliction or a disease which ultimately results in death. It is not indispensable to a conviction that the wounds be necessarily fatal. It is sufficient that they cause death indirectly through a chain of natural effects and causes unchanged by human action. This rule is applied not merely where the consequential development is in the form of an immediate infection of the wounds themselves, but also where the condition developing is anatomically disassociated from the mere external wounds, as in the case of pneumonia, or in exposure causing death. It is not requisite that the wounds be the immediate cause of death to render a defendant responsible for their consequences. It is sufficient if they be the mediate cause. Even when a wound is not mortal in itself, but for want of proper applications, or attention, or from neglect, developes into pneumonia, and that pneumonia is the immediate cause of the death of the party wounded, the party by whom the wound was given is guilty of murder or manslaughter, according to the circumstances of the case. For though the pneumonia, and not the wound, be the immediate cause of the death, yet the wound being the cause of the pneumonia is the mediate cause of the death. It is only where the death is attributable solely to the secondary agency, such as pneumonia, and is not at all induced by the primary one, the wound, that the intervention of the pneumonia constitutes a defence. So here, if the pneumonia was the sole and absolutely independent cause of the death of the deceased, this defendant is not to be held responsible; but if the wound superinduced the pneumonia, which finally caused the death, the defendant is guilty of the homicide if he inflicted the wound.

Another defence interposed on behalf of the defendant is what is commonly known as self-defence. Life may be taken lawfully in self-defence, but usually it must appear that he who takes it reasonably believed on the facts as they appeared to him at that time that he was in imminent danger of death or great bodily harm, and that no other way of escape from the danger was open to him. Ordinarily, it is the duty of one assailed to flee, if flight appears possible, and it is only when he is persuaded that he must suffer death or grievous bodily harm at the hands of his assailant, or take the life of his assailant in order to save himself, that he can justify his act as done in self-defence. But a man is not required to flee from his own home in a case like the present. Here, the defendant was at his own home and had a right to resist his assailant's attack by any means apparently made necessary by the exigency of the occasion, even to the taking of the life of his assailant, if the circumstances were such as to create a just and reasonable apprehension of

Commonwealth *v.* Grimm.

danger in the mind of a reasonable man, and did create such an apprehension in the mind of the defendant. When self-defence is alleged as a justification or excuse for a killing, the defendant must prove to the satisfaction of the jury by a fair preponderance of the evidence, or it must appear to the jury from a fair preponderance of all the evidence in the case, that the killing was done in self-defence. The raising of a reasonable doubt by a defendant as to whether or not he acted in self-defence is not sufficient to justify his acquittal. The law is that if there be a reasonable doubt that any offence has been committed by the prisoner, it operates to acquit, but if the evidence clearly establishes the killing by the prisoner with a deadly weapon, an illegal homicide of some kind is established, and the burden then falls upon the prisoner to show that it was excusable as an act of self-defence. If his evidence leaves his extenuation in doubt, he cannot be acquitted of all crime, but must be convicted of homicide in some of its grades, of manslaughter at least. But if his extenuation be proved to the satisfaction of the jury by a fair preponderance of the evidence, he should be acquitted. While all the ingredients of the Commonwealth's case must be shown beyond a reasonable doubt, this severe rule does not apply in considering an affirmative defence. There, a fair preponderance of the evidence in favor of the defendant is sufficient. To preponderate means to exceed in weight and influence. A preponderance of the evidence is where the proof on one side of a particular question overbalances the proof on the other side of the same question. It does not mean, necessarily, the testimony of a larger number of witnesses, but it means the evidence in which the jury have the more confidence and upon which they prefer to rest their judgment. In this case it becomes important for you to determine whether or not the defendant pursued his legal rights further than was necessary in order to protect himself and his family and his home from all reasonably apparent danger. If he did, then from the time the danger was over the defendant became responsible for all his acts. If not, then the defendant was protected by the law of self-defence as we have given it to you.

As we have said, the essence of a wilful, deliberate and premeditated killing is a specific and malicious intention to take life. If you are satisfied in this case, beyond a reasonable doubt, that the gun-shot wounds inflicted on the deceased by the defendant were the cause of Goldsboro's death under the law as we have given it to you, and that the killing of the deceased was unlawful and malicious, wilful, deliberate and premeditated in the sense in which we have explained those terms to you, that there was present in the mind of the defendant, at the time of the shooting of the deceased, a specific, conscious and malicious intent to take the life of the deceased, then you should return a verdict that the defendant is guilty of murder of the first degree. If you are not so satisfied, but are satisfied beyond a reasonable doubt that the gun-shot wounds inflicted on the deceased by the defendant were the cause of Goldsboro's death under the law as we have given it to you, and, therefore, that the defendant killed the deceased, and that the killing was done with legal malice, that is, through wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, but without any specific intent on the part of the defendant to take the life of the deceased, then you should return a verdict that the defendant is guilty of murder of the second degree. The degree of crime as between murder of the first degree and murder of the second degree is always a matter for the determination of the jury.

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of murder in either of its degrees, but are satisfied beyond a reasonable

doubt that the gun-shot wounds inflicted on the deceased by the defendant were the cause of Goldsboro's death under the law as we have given it to you, but find that, at the time of inflicting the gun-shot wounds on the deceased, the defendant was not actuated by legal malice, that his conduct was not the result of depravity of heart, wickedness of disposition, recklessness of consequences, cruelty or a mind regardless of social duty, but that he acted under the influence of an uncontrollable fear for the safety of himself or other members of his family, raised by the conduct of the deceased, and that the immediate circumstances, though adequate to raise the fear, were not sufficient reasonably to justify a belief on the part of the defendant that he or other members of his family were in danger, or that he acted under the influence of anger, or rage, or passion, or sudden resentment, without time to cool, upon provocation sufficient to render the mind incapable of cool reflection, then you should return a verdict that the defendant is guilty of voluntary manslaughter.

If you do not find the defendant guilty of murder in either of its degrees, nor of voluntary manslaughter, because you are not satisfied beyond a reasonable doubt that the gun-shot wounds inflicted on the deceased by the defendant were the cause of Goldsboro's death under the law as we have given it to you, but do find beyond a reasonable doubt that if said gun-shot wounds had caused the death of the deceased, the defendant would have been guilty of murder in either of its degrees, then you should return a verdict that the defendant is guilty of assault and battery with intent to kill and murder.

If you are not satisfied beyond a reasonable doubt, under the law as we have explained it to you, that the defendant is responsible for the death of the deceased under any of the evidence appearing in the case, then you should return a verdict that the defendant is not guilty.

From Luke H. Frasher, Uniontown, Pa.

NOTE 1.—Syllabus by the Court.
NOTE 2.—The defendant was convicted of voluntary manslaughter, and no appeal was taken.